IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COLONIAL SCHOOL DISTRICT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| G.K., by and through his parents, | : | |
| A.K. and S.K., and A.K. and S.K., | : | |
| individually | : | NO. 17-3377 |

O P I N I O N

JACOB P. HART                                          DATE:  4/30/2018
UNITED STATES MAGISTRATE JUDGE

The Colonial School District ("the School District") has filed this matter under Section

615(a) of the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C.

§1415(i)(2), seeking the reversal of the decision of a Hearing Officer who found it failed to

provide a free and appropriate public education ("FAPE") to G.K., a twelve year old student.  As

explained below, I find that the Hearing Officer's decision applies an erroneous standard in

several respects and should be overturned.

I.      Legal Standards

A.      The IDEA and the IEP

The IDEA offers states federal funds to assist in educating children with special needs.

Endrew F. v. Douglas County School District RE-1, 137 S. Ct. 988, 993 (2017), citing 20 U.S.C.

§1400 et seq.  In exchange, a state agrees to provide a free appropriate public education

("FAPE") to all eligible children.  Id., citing §1412(a)(1).

Services are provided to an IDEA eligible child in conformity with that child's individualized education program ("IEP"). Id. at 994, citing §1401(9)(D). The IEP is a comprehensive plan prepared by a child's "IEP Team", which includes teachers, school officials, and the child's parents. Id., citing §1414(d)(1)(B). It is generally a multi-page report describing how specific special education services and related services will be provided to the student, and it must be drafted in compliance with procedures set forth in the IDEA:

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the "special education and related services ... that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and when possible, "be involved in and make progress in the general educational curriculum." §1414(d)(1)(A)(i)(IV).

Endrew F., supra, at 994.

When disagreement arises as to the contents of the IEP, parents are entitled to what the IDEA calls a "due process hearing" before a state or local educational agency. Id., citing §1415(f)(1)(A) and (g). At the end of the administrative process, the unsuccessful party may appeal to a state or federal court. Id., citing §1415(i)(2)(A). The burden of proof is on the party bringing the administrative complaint, here A.K. and S.K., and this burden continues on appeal. Schaffer v. Weast, 546 U.S. 49 (2005).

B.      Judicial Review

Judicial review in an IDEA case is much broader than review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review. Susan N. v. Wilson School District, 70 F.3d 751, 757 (3d Cir. 1995). As a court in this District recently explained:

In cases arising under the IDEA, we apply a "modified *de novo*" standard of review, under which we give "due weight" and deference to the factual findings of the hearing officer in the administrative proceedings. <u>P.P. ex rel. Michael P. v. W. Chester Area School District</u>, 585 F.3d 727, 734 (3d Cir. 2009). While factual findings from the administrative proceedings are to be considered *prima facie* correct, we may depart from those findings if we fully explain why by citing to the administrative record. <u>S.H. v. State-Operated School District of City of Newark</u>, 336 F.3d 260, 270 (3d Cir. 2003). We must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." <u>Id.</u> (quoting <u>Carlisle Area School District v. Scott P.</u>, 62 F.3d 520, 529 (3d Cir. 1995)). The district court may not "substitute its own notions of educational policy for those of local school authorities." <u>Id.</u> Our review of legal standards and conclusions of law is plenary. <u>P.O. ex rel. Michael P.</u>, 585 F.3d at 735.

<u>Montgomery County Intermediate Unit No. 23 v. C.M.</u>, Civ. A. No. 17-1523, 2017 WL 4548022 at **1-2 (E.D. Pa. Oct. 12, 2017).

C.     <u>Standards Applicable to the Hearing Officer</u>

Decisions made by hearing officers "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 USC. §1415(f)(3)(E)(i). This is known for short as "FAPE." A procedural violation may be the basis for relief, but only where the procedural inadequacies (a) impeded the child's right to FAPE; (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to their child; or (c) caused a deprivation of educational benefits. §1415(f)(3)(E)(ii); <u>and</u> <u>see</u> <u>E.D. v. Colonial School District</u>, Civ. A. No. 09-4837, 2017 WL 1207919 at *7 (E.D. Pa. Mar. 31, 2017).

Pennsylvania regulations provide that, in an administrative procedure pertaining to the provision of services under the IDEA, "the decision of the hearing officer shall include findings of fact, discussion and conclusions of law." 22 Pa. Code §14.162. Further, "although technical rules of evidence will not be followed, the decision shall be based solely upon the substantial evidence presented at the hearing." <u>Id.</u>

II.    Factual and Procedural Background

A.    Events Preceding the Due Process Hearings

G.K. is a student identified as disabled under the category of autism, who for that reason needs special education and related services under the IDEA.  Complaint at ¶9, citing 20 U.S.C. §1401(3)(A) and 34 C.F.R. §300.8(c)(1).  A.K. and S.K. are his parents.  Complaint at ¶3.  G.K.'s disability causes difficulties particularly with reading comprehension, written expression, math problem-solving and social language/social skills.  Hearing Officer Decision at 2.  At all relevant times, G.K. attended school in the Colonial School District.  Complaint at ¶3.

In G.K.'s fourth-grade school year, 2015-2016, he received special education services.  In May, 2016, following a conference, his parents requested in writing that the School District not promote him to fifth grade for the 2016-2017 school year.  S-16 at 1.  They were concerned that G.K. had not demonstrated "grade level appropriate achievement/proficiency" in all respects, and they told the School District that they believed he should obtain mastery at the fourth-grade level before being presented with fifth grade work.  Id.

The School District denied this request.  In a letter of May 6, 2016, it stated that school data and "anecdotal information" showed that G.K. had made "excellent improvement" that year, both academically and socially.  S-16 at 2.  Also, they pointed out that G.K. would turn twelve at the end of the first semester of the 2016-2017 school year, and they stated that it would not be "appropriate or beneficial" for G.K. to be two years older than his classmates.  Id.

On May 30, 2016, A.K. and S.K. filed a Due Process Complaint, in which they stated:

We requested the [School District] to provide current assessment for G.K.'s reading and writing against 4th grade rubric, the school district has failed to provide this information.  We requested G.K.'s current IEP goals and assessment but the school district has failed to provide this information.  We feel we have the right to know where our child is assessed.

4

S-17 at 3.  Clearly, G.K.'s parents wanted to see whether the "excellent improvement" of which the School District assured them would be proved by objective testing results.

After mediation, the parents and the School District reached an agreement.  S-23.  They agreed that G.K. would advance to fifth grade.  Id.  A "facilitated" IEP meeting would be held in September, 2016.  Id.  Further, it was agreed that the parents would be provided with "Benchmark Assessment" (i.e., standardized testing) results in July, for their use in assessing G.K.'s status "in relation to other students in his grade."  The School District also agreed to pay for an Independent Educational Evaluation for G.K.  Id.

In July, 2016, Benchmark Assessment results were forwarded to A.K. and S.K.  S-27.  They showed that, while G.K. was functioned at an Advanced or Proficient level in some areas, as compared to other students finishing fourth grade, he was functioning only at a Basic level in other areas, and in some instances, was Below Basic.[1]

On Wednesday, August 17, 2016, the School District sent the parents a copy of the Independent Educational Evaluation.  S-28.  According to the evaluator, the Wechsler Individual Achievement Test showed that G.K. functioned in the Average range in most of the subtests, and in some subtests was Above Average.  Id. at 5-6.  However, he was Below Average in reading comprehension and oral expression.  Id.  Notably, the Average range was quite wide, and included areas in which G.K. scored as low as the 19th percentile.  Id.  Thus, although when

---

[1] G.K. performed at Below Basic in "Key Ideas and Details – Text Analysis", "Range of Reading" (i.e. interpretation of literature), "Operations and Algebraic Thinking – Generate and analyze patterns using one rule", and "Write with an understanding of the stylistic aspects of composition."  S-27 at 4-9.

He performed at the Basic level in "Key Ideas and Details – Main Idea", "Key Ideas and Details – Text Analysis", "Craft and Structure – Text Structure", Integration of Knowledge and Ideas", "Vocabulary Acquisition and Use", "Range of Reading" (i.e., reading independently and proficiently), "Content Standards – Response to Literature", "Numbers and Operations" "Operations and Algebraic Thinking – solve problems using the four operations", Geometry, "Numbers and Operations in Base Ten", "Write using well-developed content", and "Write with controlled and/or subtle organization."

examining composite scores, G.K. was scored Average in every area except for an Above

Average in basic reading, he was at or over the 50th percentile only in two out of nine areas.  Id.

The tester also identified deficiencies in G.K.'s concentration and focus, and set forth

strategies to address them.  Id.

A.K. and S.K. attended G.K's IEP meeting on September 27, 2016.  S-32.  According to

handwritten notes taken at that meeting, most likely by the facilitator, the parent concerns and

School District responses were:

> Parental Concern:  All areas that are basic or below basic – how will school address?
> Response:  We will write objectives that will get worked on on-going.
>
> Parental Concern:  How will I know which objective is being worked on when?
> Response:  We will send home progress notes specific to objectives and curriculum instruction map – additional info will come home on a more regular basis.
>
> Parental Concern: More rigorous homework, homework to reflect IEP.
> Response:  Daily homework based on IEP.
>
> Parental Concern:  Can we meet again in November to talk about progress toward IEP goals/objectives with homework packet?
> Response:  Yes.  Mid-November, week of November 7th.

Id. at 2.  It is also noted under Parent Concerns:  "Want tangible, measureable objectives that

explain goals."  Id. at 1.

Following the September 27, 2016, meeting, the School District produced a revised IEP.

S-34.  It appears that this was forwarded to the parents by Ms. Rebecca Kaslow, G.K.'s special

education teacher and language arts instructor at the time, on October 7, 2016.  S-36, S-37.  It set

forth five long-term "Measurable Annual Goals" in which progress measures were described

generally, such as "District and Teacher-made assessments" or "teacher/therapist observation."

Id. at 18-20.

These Annual Goals included one for reading comprehension involving answering factual and inferential questions; one for written expression; one for math word problems; a speech/language goal for producing verbal explanation; and a speech/language goal for drawing inferences as to the thinking and/or behavioral impact of a character on other characters in a picture or live scene.  Id. at 18-20.  The Annual Goals relating to reading comprehension and math word problems were accompanied by a number of Short Term Objectives, setting forth discrete sub-skills of the goal, to be evaluated by periodic data probes.  Id. at 18-21.

On October 12, 2016, S.K. wrote the following email to Ms. Kaslow:

We have carefully reviewed the IEP you've sent us, and we are afraid that the IEP goals and objectives do not appear to address the deficiencies identified in the end of school year assessments from last year.  Furthermore, we are left to wonder what additional competencies are introduced in 5th grade that G.K. must master by the end of the year.  Therefore, I think we need to have a workshop to hammer out the IEP ASAP.

S-38 at 3.

On October 14, 2016, Ms. Carole Chasen responded:

I received your email and in order to prepare for the IEP meeting, would it be possible for you to share exactly which goals and objectives you are referring to?  I am asking this just so the teachers could review what they wrote and be able to present to you possibly more of the wording that you are looking for.  The other issue you raise regarding competencies can be addressed when we meet.

Id.  The parents responded by reiterating the language in their first email:  "Our concern is that there are identified deficiencies from last school year's assessment and we are not clear as to how they are going to be addressed.  Plus, what other new competencies are introduced this school year, and how will they be addressed?"  Id.

On October 17, 2016, Ms. Chasen wrote to the parents:

The IEP team will be available to meet with you Thursday, October 20, 2016, from 8:30-9:30.  However, after just meeting with G.K.'s special education teachers to review the IEP that was developed with our input and unanimously agreed to at the September 27, 2016 PDE Facilitated IEP team meeting, we strongly believe that all of his identified

needs – based on teacher and parent input, 2015-16 end-of-year curriculum-based assessments, and finding of the Independent Educational Evaluation ... are addressed in the IEP's goals, objectives and/or SDIs. That said, prior to the meeting, kindly provide us with those specific needs that you feel have not been addressed.

The competencies that will be introduced this year are those covered in the 5th grade core curriculum which is determined by the PA Department of Education. Please let me know if you would like a link to the PDE web site listing those competencies that we are required, per PDE, to instruct. These competencies will be addressed through G.K.'s instructional programming using the Specially Designed Instruction that is identified in his IEP.

...

I look forward to receiving from you those specific needs that you feel have not been addressed prior to that meeting.

S-38 at 2.

S.K. replied on the same day: "Based on your response, I would like to file due process with the ODR regarding this matter." Id. at 2. Ms. Chasen wrote: "I am sorry you feel the need to pursue the route of Due Process, but that certainly is your right. I do need to know if you still want to meet this Thursday, October 20, 2016 at 8:30 with the IEP team to address the concerns you have. Please let me know." Id. at 1. S.K. wrote that they would not be attending the meeting. Id.

Also on October 17, 2016, S.K. filed a Due Process Complaint. In it, she wrote:

1. Parents and the school met at the end of last school year about achieving 4th grade competencies for our child prior to moving him up to 5th grade. The school officials told us that our child met all the competencies to move up. Upon reviewing the assessments conducted by the school, our child had many areas that were either basic or below basic in achievements.

2. Our child G.K. is placed in 5th grade with dubious IEP goals and objectives where we the parents have very little confidence that our child will be able to complete 5th grade successfully with passing grade/competencies.

Due Process Complaint at 2.  S.K. also wrote: "1.  The support services are insufficient, if not inadequate" and "2.  Current draft version of IEP goals do not appear to address the core needs of the child."  Id. at 3.

In the section asking "How would you like to see this resolved?", S.K. wrote:

> We would like the school district to pay for a third party to construct (develop) IEP goals and implement the additional support (instructions) outside of the school, so that our child will be able to meet the competencies of a 5th grade student at the end of the school year.

Id.

A hearing before the Hearing Officer was scheduled for mid-December, 2016.  Hearing Officer Decision at 1, n. 1.  However, the parents rescheduled the hearing to allow them to consult an attorney.  Id.  Two hearing sessions were held on February 8 and 23, 2017.  Hearing Transcripts of February 8 and 23, 2017.  A final session was held on May 22, 2017.  Hearing Transcript of May 22, 2017.  At the hearing sessions, the parties were not represented by counsel, and A.K. did all the questioning of witnesses on G.K.'s behalf.

There is no evidence in the record reflecting whether the parties had any contact between the filing of the Due Process Complaint and the hearings for the purpose of changing G.K.'s IEP or any of the goals.

B.       The Due Process Hearings

At the hearing, testimony was taken from Ahtoi Gibbons, a private speech and language pathologist; Natalie McDonald, a director at the Huntington Learning Centers; Sheila Sives, a speech and language pathologist employed by the School District; Rebecca Kaslow; Bridget Craig, a G.K.'s special education math teacher; and Elizabeth Davis, who replaced Ms. Kaslow as G.K.'s language arts teacher after Thanksgiving, 2016.  Hearing Transcripts of February 8 and 23, 2017, and May 22, 2017.

At many points, A.K. reiterated the issue he and S.K. had raised in their facilitated IEP meeting; they were concerned that the standards of assessment built into G.K.'s IEP were not linked to any consistent, objective testing.  It appears that the parents worried that apparent success could be obtained by giving G.K. very easy material in class, while objective testing showed that he was not moving forward.

This concern was apparent in A.K.'s questioning of Sheila Sives:

> We are asking a child of a situation where we are asking him to read 5th grade complexity material or experiences that are as complex for a 5th grader should be different than it is for, say, a 1st grader.  So, we can say that when we are measuring the 80th percentile, we don't know what standard you're measuring against, because it's really not saying, to me, at least, how its written in the goal.  It doesn't tell me what standard you're asking it from. ... If we don't have that level of measurement standard, is what I'm hearing you're saying, then how do we know that this assessment at the end of the day was accurate or appropriate?
>
> ...
>
> So, for me to summarize, my question is I wish there was some kind of standard to say if you do this type of complexity material, because there is a reading rubric, I'm sure there is, for a 5th grader, 4th grader, 3rd grader, when we are engaging a child with problem solving skills, we should be asking a child to read or encounter in a situation that is at a 5th grade rubric for the reading situation and be able to solve that issue.  Then I would say that if you are able to do that in 80th percentile, I have no problem accepting this goal and objective in the IEP.  ...  What I'm saying is if you're going to read him the story, that story should be – is that a 5th grade level storybook, or is it a 4th grade storybook, or a 1st grade storybook.  That's what I'm trying to say.  That's what should be stated in this goal, is why I could not agree with this IEP.

Transcript of February 8, 2017, at 101-104.

Similarly, when questioning Rebecca Kaslow, A.K. expressed the opinion that the IEP language goals did not reflect the areas in which Benchmark Assessment results showed G.K. was struggling.  Id. at 210-214.  He said:

> I'm asking if any one of these items, where reading comprehension is concerned is marked as basic or below basic [on the Benchmark Assessment results], I'll be able to correlate to one of these goals [on the IEP].  If not, can we add the goal in here, is what I'm asking, so that we are covering al the bases. .... [W]ill I be able to, at the end of the

day when I get the report, be able to look at the IEP goal and say was it identified or did he miss that one?  ... If you will, ... the goal is not stating or using the same standard or same measurement to what he's being assessed is what I'm sensing here.

Id. at 215-217.

Kaslow argued that the Benchmark Assessment results could not be used as the sole criteria for measuring the presence or absence of progress in G.K., because:

when he takes that final assessment there's a whole number of factors that could contribute to him not being proficient or advanced in the standard.  Not because he's not capable, but maybe that day maybe he fell at recess and he got hurt and he's not going to able to focus as much.  Maybe the text he's reading he has zero interest in.  Maybe the text he has to read has concepts, has ideas he has no connection with.  That will impact how he performs in those standards.

Id. at 214.

To A.K., however, this answer was frustrating, as it seemed to imply that no objective standard of assessment was possible:

So, this brings to the very thrust of my complaint, one of the complaints, that is, how do I know that we made sufficient progress so that I'm satisfied that he met the goal or he didn't meet the goal?  How do I know that?  And in the BAS report, you say he had a bad day, we only tested three things, and he  missed two of them, or we only had one question and he  missed it because he was having a bad day, and he got below basic on one of the categories.  Well, I think I've said this before in IEP meetings, and I'm going to say it again, for the record, if a child  has basic assessment because there was only one question instead of twenty questions, and he blew that one question, so he completely got it wrong or below basic in that area, what do you do with that?

Id. at 222.

Later, toward the end of the third hearing session, A.K. restated this:  "My biggest concern here is the School, time after time, comes back to us saying he met all the goals, but then when we give him [standardized testing], he does not meet the goal.  He has below basic assessments here, there, everywhere."  Id. at 410.  Further, because spring standardized testing results are not provided until the next September, the parents lacked a way to immediately verify the School District's claim that their son made substantial progress.  Id.

11

Through Natalie McDonald, A.K. and S.K. also presented testimony that, although school testing showed that G.K. was reading on grade level, testing from the Huntington Learning Centers had him reading at a second grade level independently, and an instructional third grade level.  Id. at 41, 164.

As for the School District witnesses, Ms. Sives testified that she spoke first at the IEP meeting, but that the parents had no questions for her, and that A.K. just asked her "can we just get on with it?"  Id. at 72.

She also testified:

A.K. had requested that there be a more broken-down display of information on how G.K. was progressing toward his academic goals, and the team decided that we would add objectives to his academic goals so that things were more carefully presented so the Parents could understand exactly the subskills that led to the greater goal.  And I believe my recollection is that the agreement was that those changes would be made and another draft issued to the Parents.

Id. at 74.  She further testified that that G.K.'s IEP goals were appropriate, and addressed his weaknesses as revealed in objective testing.  Id. at 75, 86-87.

Similarly, Ms. Kaslow testified that, at the IEP meeting:

A.K. expressed how from PSSA, another 3rd year benchmark, that there were standards that he was not proficient in.  So, after discussion and suggestion, we decided, then, to add five objectives addressing those standards of weakness to the bigger goal, to more closely progress-monitor and to see clear progress in those standards where he was basic or below basic.

Id. at 139.

Ms. Craig, G.K.'s special needs math instructor, also testified that the objectives were added to address A.K.'s concerns about areas where G.K. was below grade level as shown on standardized testing.  Transcript of February, 23, 2017, at 242.  She said that adding objectives was "a good way to solve the program", so that "when he received a report on progress, he would see specifically what we were working on."  Id.

Ms. Davis became G.K.'s language arts instructor only after the Due Process Complaint had been filed, and had not attended the IEP meeting. However, she agreed with the lawyer for the School District that G.K.'s instructional program was appropriate, and that it was "sufficiently comprehensive to meet his reasonably identified educational needs." Transcript of May 22, 2017 at 397-8.

Although the Due Process Hearing was nominally to evaluate the September, 2016, IEP, the Hearing Officer entered into evidence a number of documents created after that date, including G.K.'s November, 2016, Benchmark Mathematics Performance Testing, a chart showing the results of all September and November Benchmark testing, and language arts assessment data through May, 2017. S-55 through 59.

C.    The Hearing Officer's Decision

On June 13, 2017, the Hearing Officer issued his written Decision. In it, he awarded G.K. 300 hours of compensatory education, and a comprehensive reading evaluation funded by the School District. Decision at 15. He also stipulated as to the contents of certain IEP goals[2], and directed that an IEP meeting take place no later than August 20, 2017, and that the information obtained in the reading evaluation be included in G.K.'s reading programming. Id.

Unfortunately, the bases for the Decision are not entirely clear. In the Introduction section, the Hearing Officer wrote:

> For the reasons set forth below, I find that on certain goals in the student's individualized education program ("IEP"), the student did not make progress. In other instances, I find that there are substantive issues and procedural violations that amount to a denial of FAPE. Therefore, compensatory education will be awarded. However, there is much in

_____

[2] As discussed below, some of G.K.'s IEP goals, as set forth in his evaluations, differed from those set forth in the September, 2016, IEP. Presumably, by specifying what the goals are in the IEP, the Hearing Officer is referring to the IEP for the 2016-7 school year, even though that year was essentially over by the date of the decision. It is doubtful that he would have the authority to dictate the contents of a 2017-2018 IEP which was not even drafted at the time of his decision.

the student's programming that evidences appropriate IEP goals, and that programming
and those goals will be addressed in directives to the student's IEP team.

Decision at 2.

Under the next heading, the Hearing Officer identified two "Issues": "Did the student

make progress on goals under the currently implemented IEP?", and "Is the proposed September,

2017, [*sic* "2016", I assume] IEP appropriate?" Id. at 3.

However, in the "Discussion and Conclusions of Law" section of his Decision, the

Hearing Officer wrote:

> In this case, two broad findings must be stated at the outset. First, the student
> made progress on many (although not all) IEP goals over the course of the 2016-
> 2017 school year. And, second, those IEP goals are appropriate, although there is
> a degree of explanation necessary in that regard as set forth below. What is
> problematic, to the point where the student was denied FAPE and/or the parents
> were denied an appropriate level of parental participation in the IEP process, is a
> host of substantive and procedural issues over the course of the school year.

Id. at 11.

The phrase "host of substantive and procedural issues" apparently refers to three subjects

subsequently discussed on pages 11-14 of the Decision. The Hearing Officer wrote:

> One, the student's original speech and language for situational-reasoning was
> inappropriate as written. The fatal aspect of the goal is how the student's responses were
> gauged for accuracy as "mak[ing] sense to the listener." The problem here is two-fold:
> First, the listener subjectively makes the decision as to whether the response is accurate;
> while there may be a degree of subjectivity in such a goal, here progress is leveraged
> entirely on the listener without any objectivity in the assessment. Second, the goal is
> ostensibly to allow the student to reason through social, inferential, and problem-solving
> situations; where one listener begins to understand the student's communication and
> interaction patterns, "making sense" may take place with that listener while a different
> listener without a history with the student may view the accuracy of the student's
> responses differently. This is a prejudicial flaw in the situational-reasoning goal.

Id. at 12.

Secondly, the Hearing Officer wrote that the reading goal was defective for failing to specify the grade-level on which G.K. was being instructed: "The first reading goal had a BAS baseline level of S/beginning 5th grade. The goal was written, however, for achievement at the beginning of 6th grade reading-level." Id. The Hearing Officer also noted that, at the beginning of fourth grade, G.K. was found to read at BAS level M/end of second grade, and wrote: "In 4th grade, then, it seems highly questionable that the student started the school year at a second grade instructional level, scored well below goal achievement levels and began 4th grade [*sic* "5th grade] at a beginning 5th grade reading level." Id. at 13. He concluded, however, that there was insufficient evidence on the record to show that this represented a substantive flaw in the IEP, although the "private reading assessment" showed a reading level much lower than fifth grade. Id.

He continued:

> What is quite clear, however, is that the goal design and progress monitoring do not allow parents to understand the terms of progress for the student's reading. This obviously impedes their ability to participate meaningfully in understanding implementation of the student's special education programming. Compensatory education will be awarded.

Id.

Finally, the Hearing Officer was disturbed by the fact that the goals for speech and language, and the goals for written expression were changed, and short-term goals were added, at some time between October 7, 2016, when parents were given the revised September, 2016, IEP, and May, 2017, the last date on which data was collected for G.K.'s periodic assessments. See S-34, S-59.

He wrote that these changes produced "a sea change not only in the goal but in the assessment of that goal", continuing:

> And although the exact timing of these goal changes is not known, it appears that the changes in the goals all occurred after the parents' complaint was filed in late October, 2016, which would be a violation of the pendency/stay-put obligation of the District. This is not a legal conclusion, however, because the exact timing of the goal changes cannot be ascertained on this record. There is also no signed notice of recommended educational placement ("NOREP") in the record, so perhaps the parents agreed to these goal changes. Even if this is the case, though, the September, 2016, IEP of record includes the original goals, not the updated goals listed on the progress monitoring. Given the tenor of this record and parents' views, however, it is preponderant that the parents were not involved in the wholesale changes of the goals and, even if they were, those changes were not reflected in the IEP of record. Therefore, compensatory education will be awarded.

Decision at 14.

C.    The School District's Complaint

In its Complaint, the School District alleged a myriad of errors of fact and law made by the Hearing Officer. Without transcribing all of these (generally set forth at ¶¶ 33-48 of the Complaint), it is possible to identify three major areas of appeal, each of which is discussed in the School District's Motion for Summary Judgment.

First, the School District argues that the Hearing Officer erred in changing the issue for decision from the appropriateness of the September, 2016, IEP, to whether G.K. made sufficient progress during his fifth grade year. Complaint at ¶¶ 27-30. This was not a permissible basis for an award of relief. Additionally – according to the School District – by evaluating G.K.'s progress throughout the year, the Hearing Officer wrongly considered much evidence that was created after the 2016 IEP, which the parents did appeal, in order to criticize goals and assessments which were included for the first time in a subsequent IEP, written in February, 2017, which the parents did not appeal.

Secondly, the School District maintains that the Hearing Officer erred in finding a violation of the parental right to meaningful participation in the development of the IEP. Complaint at ¶32.

Thirdly, the School District argues that, by making a negative inference based on the gap between G.K.'s performance on a September, 2015 reading assessment and a September, 2016, assessment, the Hearing Officer wrongly shifted the burden to the School District to prove it had *not* acted wrongly in regard to determining G.K.'s reading level. Complaint at ¶¶ 31.

III.    Discussion

A.    Progress Under an IEP is Not a Proper Measure of its Appropriateness

The School District is correct in arguing that it cannot be determined whether an IEP was appropriate solely by evaluating a child's progress or lack of progress under that IEP. In Board of Education of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley, 458 U.S. 176 (1982), the United States Supreme Court for the first time addressed the FAPE requirement. It held that the IDEA guarantees an education program that is "reasonably calculated to enable the child to receive educational benefits." Id. at 207. However, it did not "guarantee any particular level of education." Id. at 192. Recently, the Supreme Court reiterated that finding, adding: "No law could do that – for any child." Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1, 137 S. Ct. 988, 998 (2017).

The Court of Appeals for the Third Circuit has interpreted Rowley to mean that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann v. East Hanover Board of Education, 993 F.2d 1031, 1040 (3d Cir. 1993). The Fuhrmann court continued: "Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's

placement." Id.  In a later case, the Court of Appeals further expanded on its holding in

Fuhrmann:

> The dangers inherent in this process of second-guessing the decisions of a school district with information to which it could not possibly have had access at the time it made those decisions are great. ... [I]t indeed would be unfair to adopt a rule under which a district would be financially penalized for an IEP that, while apparently appropriate at the time it was developed, turned out in hindsight to be inadequate.

Susan N. v. Wilson School District, 70 F.3d 751, 762 (3d Cir. 1995).

Accordingly, even though an IEP must be reasonably calculated to enable a child to make appropriate progress, it can be found to do so even if the child did not meet all of his IEP goals. Brandywine Heights Area School District v. B.M., 248 F. Supp.3d 618, 636 (E.D. Pa. 2017).  In other words, a failure to make progress under an IEP does not necessarily indicate a denial of FAPE.  Carlisle Area School District v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995) *amended* (Oct. 24, 1995); G.L. v. Saucon Valley School District, 267 F. Supp. 3d 586, 612 (E.D. Pa. 2017) (citing J.L. v. Mercer Island School District, No. Co6-494MJP, 2010 WL 3947373 (W.D. Wash. Oct. 6, 2010):  "To suggest that 'failure to attain IEP objectives equals an IDEA violation is to set the bar on special education far too high"); L.R. v. Manheim Township School District, 540 F. Supp.2d 603, 619-20 (E.D. Pa. 2008).

This is not to say that evidence of occurrences after the IEP was made – including evidence of a student's progress – is irrelevant, but it can be used only to evaluate the reasonableness of the school district's decisions at the time they were made.  D.S. v. Bayonne Board of Education, 602 F.3d 553, 564-5 (3d Cir. 2010); L.R. v. Manheim, supra.

For this reason, the Hearing Officer acted improperly in identifying: "Did the student make progress on goals under the currently implemented IEP?" as one of the two controlling issues in his Decision. Decision at 3. He erred in explicitly basing his grant of compensatory education on his finding that "on certain goals ... the student did not make progress." Decision at 2.

A.K. and S.K. argue that these statements are not important, because the lack of progress was not, ultimately, the basis for the Hearing Officer's decision. They point to the part of the Decision where the Hearing Officer stated that FAPE was denied "and/or the parents were denied an appropriate level of parental participation in the IEP progress" because of the substantive and procedural issues which arose "over the course of the school year." Decision at 11.

In reality, however, the Hearing Officer set forth two different bases for his decision: one in the Introduction, and one in his Legal Conclusions. It is true that the Hearing Officer discussed the "substantive and procedural issues," but never specified which goals he found inappropriate, as the Introduction suggested that he would. Possibly, he simply forgot to edit the Introduction to bring it into line with his eventual Legal Conclusions. However, it is impossible to pretend that pages two and three are not part of the Decision. For that reason, it is necessary to specify that to the extent that the Hearing Officer relied upon a lack of progress by G.K., with no other showing of a denial of FAPE, his decision is invalid.[3]

---

[3] At the same time, it was probably not erroneous for the Hearing Officer to request and review evidence of G.K.'s progress under the September, 2016, IEP, to the extent that he used it to determine whether the goal-evaluation provided in that IEP was inadequate, as the parents argued.

B.    The Parents' Right of Participation Was Not Violated

The IDEA recognizes the importance – and, indeed the necessity – of parental participation in both the development of an IEP and any subsequent assessment of its effectiveness.  Honig v. Doe, 484 U.S. 305, 311 (1988).  Accordingly, it establishes various procedural safeguards which guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education, and the right to seek review of decisions they believe are inappropriate.  Id.

As the United States Supreme Court has said:

These safeguards include the right to examine all relevant records pertaining to the identification, evaluation, and educational placement of their child; prior written notice whenever the responsible educational agency proposes (or refuses) to change the child's placement or program; an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for an impartial "due process hearing."

Id. at 484 U.S. 311-312, citing 20 USC §1415; see also Christen G. v. Lower Merion School District, 919 F. Supp. 793, 798 (E.D. Pa. 1996).

The IDEA permits a Hearing Officer to find that a child was denied FAPE where procedural inadequacies "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child."  20 U.S.C. §1415(f)(3)(E)(ii)(I).  The parameters of this right are set forth in the regulations at 34 CFR §300.322, entitled "Parent Participation."

The School District argues that the Hearing Officer erred in finding that it violated G.K. and S.K.'s right to parental participation.  G.K. and S.K. respond that the Hearing Officer was correct.  They point to language in the regulation which states that the public agency (here, the School District) "must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting."  §300.322(e).

However, the language of that section – and the entire regulation – makes it clear that the parents' right to participation is narrower than Defendants suggest.  In its entirety, the sentence cited by G.K. and S.K. reads:  "The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP team meeting, **including arranging for an interpreter for parents with deafness or whose native language is other than English**."  §300.322(e).  (Bold supplied).  Clearly, this regulation guarantees something much more basic than a deep intellectual understanding of the pedagogy underlying an IEP.

The other duties imposed upon the School District by §300.322(e) are equally basic.  The School District must: ensure that the parents are present at the meeting by giving them proper notification and finding a mutually agreeable time and place; inform them in a notice of the purpose, time and place of the meeting, and of their right to participate; consider alternatives to physical presence of the parents, such as a phone conference, if necessary; hold a conference without a parent present only when efforts to obtain the parent's presence are well-documented; and provide the parent with a copy of the IEP at no charge.

There is absolutely no evidence that the School District failed to comply with any of the guarantees of parental participation in the IDEA and its regulations, as explained in Honig.  Nor have the parents ever raised such a claim.  Therefore, the School District did not violate the parents' legal right to participate with regard to the September, 2016, IEP.

The Hearing Officer based his legal conclusion that the parents' right to participation was violated on the finding that the IEP's goal design and progress monitoring "did not permit the parents to understand the terms of progress for the student's reading."  Decision at 13.  However, this concern goes far beyond what is legally required.

More importantly, to say that G.K.'s parents did not understand how his progress was measured under the IEP is a mischaracterization of the evidence. It would be more accurate to say that A.K. and S.K. had an affirmative belief that progress was measured inadequately. As discussed above, the facilitator's notes from the September 27, 2016, IEP meeting show that the parents wanted "tangible, measurable objectives that explain goals." S-32. They wanted the IEP to address every area where Benchmark Testing showed that their son was "basic" or "below basic." Id. The parents also wanted to be informed as to which objective G.K. was working on at a given time. Id.

When G.K.'s teachers added short-term goals to the IEP in order to address the parents' concerns, the parents did not claim that they could not understand the goals, or ask for any clarification. Instead, as discussed above, S.K. wrote: "We have carefully reviewed the IEP you've sent us, and we are afraid that the IEP goals and objectives **do not appear to address the deficiencies identified in the end of school year assessments from last year**." S-38 at 3. (Emphasis supplied). Despite Ms. Chasen's several requests that they identify specific problems with specific goals, the parents did not do so, and they refused to meet with the School District again before filing a Due Process Complaint. S-38 at 2 and 3.

Again, the Due Process Complaint did not indicate that the parents did not comprehend the IEP or found it confusing in any respect. Instead, the parents wrote that the goals and objectives in the IEP were "dubious," the support services were inadequate, and the IEP goals did not address "the core needs of the child." Due Process Complaint at 2.

Even at the Due Process Hearing, A.K. never said that he did not understand the goals in the September, 2016, IEP. Instead, as discussed above, he was displeased that the standards of assessment built into G.K.'s IEP were not linked to objective testing.

Thus, it was not a failure to understand the September, 2016, IEP that was at issue in this case. There was, instead, a dissatisfaction on the part of the parents with how progress was measured. In a case raising similar issues, the Honorable Nitza Quiñones Alejandro explained that there is a distinction between a right to participate in the creation of an IEP and a right to dictate its contents:

> "[A]lthough parents are members of the IEP team and entitled to full participation in the IEP process, they do not have the right to control it." K.C. ex rel. Her Parents v. Nazareth Area School District, 806 F. Supp.2d 806, 829 (E.D. Pa. 2011) (citing Kasenia R. ex rel. M.R. v. Brookline School District, 588 F. Supp.2d 175 (D.N.H. 2008)). Nor, as stated, do parents have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student. J.E. [v. Boyertown Area School District], 834 F. Supp. [240], 246 (citing [Board of Ed. of Hendrick Hudson Central Sch. Dist. Westchester Cty. v.] Rowley, 458 U.S. [176] at 199 [(1982)]; see also Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580, 259 F. Supp.2d 880, 885 (D. Minn. 2003) ("The fact that the Slamas were not allowed to choose every facet of their daughter's education was not, however, a denial of FAPE ... no parent of a public school child – whether the child is disabled or not – is entitled to select every component of the child's education").

G.K. ex rel. C.B. v. Montgomery County Intermediate Unit, Civ. A. No. 13-4538, 2015 WL 4395153 at *15 (E.D. Pa. July 17, 2015).

This is not to say that the Courts would overlook a School District simply permitting the parents to make a token contribution, and then summarily discarding it. The right to participation must require that parents' contributions be honestly considered. Here, however, there was global agreement that G.K.'s weaknesses were in reading comprehension and oral expression – particularly in making inferences or taking another person's point of view; writing; and in mathematical word problems. These were his areas of deficiency on the Benchmark Assessment. S-27. These are also the subjects of all of his IEP goals. S-34 at 18-21. Moreover, it is undisputed that the School District added short-term goals in order to address the parents' desire for better measuring of progress. Id.

As discussed on pages eight and nine of this Decision, it appears that A.K. believed the progress monitoring should have been linked to the Benchmark Assessments, so that G.K.'s annual Benchmark results would determine whether or not he had made substantial progress during the year. Ms. Kaslow disagreed with this approach. It is possible that, despite the disagreement of the School District, the method A.K. outlined for progress measurement was feasible, and even desirable. However, he did not have a legal right to it, or to obtain any other specific method of measuring G.K.'s progress. This is not what FAPE requires. Thus, to the extent that the Hearing Officer's decision relied upon a violation of the parents' participation rights, it lacks a legal basis.

C.      The Specific Issues Raised by the Hearing Officer

Having explained why I do not consider G.K.'s imperfect progress, or a violation of the parents' participation rights, a valid basis for relief, I turn to the specific substantive and procedural issues discussed by the Hearing Officer to determine if any of them resulted in a denial of FAPE for any other reason.

1.      The Speech and Language and Written Expression Goals

The Hearing Officer observed that the goals for speech and language, as well as written expression, as set forth on G.K.'s May, 2017, Goals Progress Report, were completely different from the goals included in his revised September, 2016, IEP. Compare S-59 at 3 (written expression) and 4 (speech and language), with S-34 at 19 (written expression) and 20 (speech and language).

As above, the Hearing Officer strongly disapproved of this change in goals, writing:

And although the exact timing of these goal changes is not known, it appears that the changes in the goals all occurred after the parents' complaint was filed in late October, 2016, which would be a violation of the pendency/stay-put obligation of the District. This is not a legal conclusion, however, because the exact timing of the goal changes

cannot be ascertained on this record. There is also no signed notice of recommended educational placement ("NOREP") in the record, so perhaps the parents agreed to these goal changes. Even if this is the case, though, the September, 2016, IEP of record includes the original goals, not the updated goals listed on the progress monitoring. Given the tenor of this record and parents' views, however, it is preponderant that the parents were not involved in the wholesale changes of the goals and, even if they were, those changes were not reflected in the IEP of record. Therefore, compensatory education will be awarded.

Hearing Officer Decision at 14.

There is quite a bit wrong with this analysis. Most importantly, the Hearing Officer has illogically made a legal conclusion that the School District wrongly excluded A.K. and S.K. from participating in the change of IEP goals – at the same time that he admitted that he had no evidence that this happened.

Also unsupportable is the Hearing Officer's conclusion that the School District should be punished for having changed the IEP goals *even if* the parents "agreed to these goal changes." The IDEA "stay put" obligation does not apply if the parents agree to a change.[4] Even disregarding the stay-put provision, the IDEA framework is intended to benefit the child, not to trap him in an IEP that no one wants. There is no apparent legal basis for finding the School District at fault here if the parents agreed to the changes.[5]

Even now, it remains a mystery whether the parents agreed to the new goals. The School District has not affirmed that the parents were included in the process, but the Defendants have not asserted that they were excluded.

---

[4] During the pendency of IDEA proceedings, a child is to remain in his or her then-current educational placement, unless the parents agree otherwise. 20 USC §1415(e)(3); Drinker by Drinker v. Colonial School District, 78 F.3d 859, 863-4 (3d Cir. 1996). The purpose of the section was to strip schools of their unilateral authority to exclude disabled students from school. Drinker, supra, citing Honig v. Doe, supra, at 484 U.S. 323.

[5] It should be noted that the changes clearly are intended to provide more of what the parents requested. For example, the original Speech and Language goal – which the Hearing Officer criticized for its subjectivity, as discussed below – was changed to provide a more objective method of assessment.

Nor can it be determined when the goals were changed. The Hearing Officer has stated that they were changed "at some time in the fall of 2016." Hearing Officer Decision at 7, ¶ 28 and 9, ¶ 39. The School District appears to argue that these changes were made as part of the development "of a new IEP in February, 2017." Complaint at ¶24e.

In the face of this absence of evidence, the School District erred in deciding that the changed goals were a basis for relief. What is more, the School District could not have known to provide evidence on this matter at the Due Process Hearing. The parents never complained about the changed goals. A.K. did not question any School District witness about them at any of the three Due Process Hearing sessions. Neither did the Hearing Officer.

2.    The Original Speech and Language Goal

As set forth in the September, 2016, IEP, G.K. had two Speech and Language goals. The first stated: "G.K. will provide verbal explanations to support his responses to a variety of reasoning tasks (e.g., "Why/How" questions, problem-solving, problem avoidance, inferences, taking the perspective of others) which make sense to his listener with 80% accuracy over three observations in various educational settings." S-34 at 20.

The Hearing Officer called that goal "inappropriate." Hearing Officer Decision at 11. It's "fatal aspect" was that G.K.'s responses were assessed for accuracy in terms of whether they "ma[de] sense to the listener." Id.

The Hearing Officer was obviously correct in pointing out that the goal's assessment standard was subjective, and that results would also depend on the identity of the listener. Id. Nevertheless, this flaw in the goal is simply not serious enough to be considered a deprivation of a fair and appropriate public education.

This is particularly true because, as Ms. Sives explained, speech therapy addresses a social skill, rather than an academic one, and is for that reason harder to quantify. She said: "There's not an objective rubric I can go to, because these are nebulous skills that are different in different situations. So, it's very hard to make this objective." Id. at 101.

It is also improper to grant relief on the basis of this goal, because the School District never refused a request from the parents to change it. As discussed above, Ms. Sives testified that A.K. did not criticize her goals at the September 27, 2016, IEP meeting, but instead asked "can we just get on with it?" Record at 72. If A.K. had asked for a more objective standard of assessment, it is possible that Ms. Sives would have altered her goals after the IEP meeting, as the other teachers did.

3.    G.K.'s Instructional Reading Level

The last specific concern identified by the Hearing Officer overlaps with the third major issue raised by the School District, so I will discuss them together. It concerns G.K.'s instructional reading level.

The Hearing Officer criticized G.K.'s reading goal, as set forth in the IEP, on the ground that the reading level on which he was being instructed was not adequately identified. This was an issue which also concerned A.K., as discussed above. The Hearing Officer admitted, however, that documents available to the parents showed that G.K.'s starting reading had been found to be at BAS Level S/beginning fifth grade, and that it changed during the year to BAS Level T/beginning-middle of fifth grade. Hearing Officer Decision at 12.

However, the Hearing Officer complained that it was unclear "whether the student was presented with any sixth grade reading material." Id. Also, the reading level was not specified on the reading probes taken between September, 2016, and May, 2017. Id.

The Hearing Officer went on to point out that, at the end of G.K.'s fourth grade year, he was found to read at BAS Level M/end of second grade reading level.  Id. at 13, citing S-12 at 5. He then pointed out that G.K. was not especially successful on his fourth grade reading probes. Id.  He wrote:

> In fourth grade, then, it seems highly questionable that the student started the school year at a second grade instructional level, scored well below goal-achievement levels and began fourth grade at a beginning fifth grade reading level.  The record was not developed enough to allow this disparity of reading levels between the October, 2015, and September, 2016, IEPs to be characterized as a substantive flaw, but in the context of the other IEP flaws, it is a reasonable question, especially in light of the private reading assessment.

Id. at 13.

After this, the Hearing Officer made the statement quoted *infra* at page 15, that "the goal design and progress monitoring do not allow parents to understand the terms of progress for the student's reading," which "impede[d] their ability to participate meaningfully in understanding implementation of the student's special education programming."  Id.

Here, again, the lack of a defined reading instructional level in the IEP and at each probe could legitimately be criticized, but the Hearing Officer has exaggerated its importance.  As the Hearing Officer conceded, the parents were informed as to their son's assessed reading level during the year.  Further, the IEP goals and the probes informed the parents of the areas in which G.K. was being instructed and tested.  This defect in the IEP did not deprive A.K. and S.K. of their right to participate in IEP development.

What remains is the second instance in which the Hearing Officer has accused the School District of substantial wrongdoing, even while admitting that he lacked the evidence to do so. Indeed "the record was not developed enough" to support his implication that the School District somehow manipulated G.K.'s reading level assessment.[6]

Further, the School District is correct in arguing that the Hearing Officer has in this regard wrongly shifted to it the burden of proving that it did not misrepresent G.K.'s reading levels. This would have been for the parents to prove, as the parties seeking relief in the Due Process proceedings.

IV.    Conclusion

For the reasons discussed at length above, I conclude that the Hearing Officer's Decision lacks an appropriate legal basis for an award of relief. Further, although the September, 2016, IEP was not perfect in all respects, I conclude that it did not deny G.K. the fair, appropriate, public education to which he is entitled by the IDEA.

G.K., A.K. and S.K. should not be required to disgorge any relief they have already been provided, because this would impose a financial burden which might discourage them or others from seeking relief to which they believe they are entitled. Nevertheless, in a separate Order of this date, I will grant the School District's Motion for Summary Judgment, and will deny the Motion for Summary Judgment filed by the Defendants.

BY THE COURT:

/s/Jacob P. Hart

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

---

[6] The Hearing Officer's reference to the private reading evaluation is not particularly convincing. It is not clear why the parents and the Hearing Officer uncritically assume that the assessment of the Huntington Learning Center, a for-profit concern with an obvious motive for finding that G.K. reads significantly below grade level, is more reliable than school testing.

29